FILED

**IN THE UNITED STATES DISTRICT COURT** 2017 AUG 17  PH 3: 51
**MIDDLE DISTRICT OF FLORIDA**

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

| | |
|---|---|
| UNITED STATES OF AMERICA, *EX REL.* JAIME VARGAS, | Civil Action No. 3:16-cv-1329-J-25PDB |
| Plaintiff | |
| v. | |
| LINCARE, INC., and OPTIGEN, INC., | |
| Defendants | |

**FILED IN CAMERA AND
UNDER SEAL**

**DO NOT ENTER IN PACER**

**FIRST AMENDED COMPLAINT**

*Qui Tam* Plaintiff Jaime Vargas, through his attorneys, on behalf of the United States of
America, for his First Amended Complaint against the defendants identified below, alleges,
based upon his personal knowledge, and relevant documents, as follows:

**JURISDICTION AND VENUE**

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28
U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this
Court for actions brought pursuant to 31 U.S.C. § 3729 and 3730.

2.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) and 31
U.S.C. § 3732(a) because the Defendants have their principal places of business in this district,
and because many of the fraudulent acts alleged herein carried out in this district.

## PARTIES

3.      Plaintiff Jaime Vargas ("Plaintiff" or "Relator") is a *Qui Tam* Plaintiff/Relator in

this action and is a resident of Florida.  Plaintiff is a Registered Respiratory Therapist.  Between

January 2004 and April 2013, Plaintiff was employed by Lincare, Inc. ("Lincare").  Between

2005 and December 2011, he was employed as a Regional Health Care Services Manager, at its

offices in Colorado Springs, Colorado.  His responsibilities in that position included for a

multistate region including Colorado, all of the Health Care Specialists' (Lincare's clinical staff)

clinical training and location operational compliance with applicable Medicare and other

regulatory standards, and with Lincare internal Policies and procedures.  Between December

2011 and April 2013, inclusive, Plaintiff was employed as Region Healthcare Service Manager

(for administrative purposes, Defendant Optigen, Inc. ("Optigen") was considered a "region"

after it was acquired by Lincare) with responsibility for managing independent "Field Clinicians"

who were retained, on a contract basis, by Optigen, to perform installations of certain durable

medical equipment.  Although his responsibilities pertained to Optigen, and he was based at

Optigen's offices in Jacksonville Beach, Florida, Plaintiff was at all times employed by Lincare.

4.      Defendant Lincare is a Delaware corporation with its principal executive offices

in Clearwater, Florida. Defendant transacts business nationwide, including in this district.

Lincare has at least six offices within this district.  Lincare is the principal operating subsidiary

of Lincare Holdings, Inc. ("Lincare Holdings").  Lincare Holdings, until approximately June

2012, was a publicly traded company.  At or around that time, its shares were acquired by Linde

AG, a German corporation.  Lincare, with its affiliates, is the among the nation's largest

providers of oxygen and other respiratory therapy services to in-home patients, including the

rental or sale of durable medical equipment, including CPAP devices.

5.      Defendant Optigen is a Florida corporation with its principle place of business in

Jacksonville Beach, Florida. Optigen transacts business nationwide, including in this district.  In

or around May 2011, Optigen was acquired by Lincare Holdings, and has been a wholly owned

subsidiary of Lincare Holdings at all times since. Tricare, the entity to which most Optigen services are billed, is located in this district. Following the acquisition of Optigen by Lincare Holdings, many of the operations of Lincare and Optigen were integrated, as reflected by the Relator's continued employment with Lincare with responsibilities related to Optigen's operations.

## FACTUAL BACKGROUND

### The Medicare Program

6.      In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled.

7.      Medicare is a health insurance program for people age 65 or older, people under age 65 with certain disabilities, and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

8.      Medicare now has three programs, referred to as: Part A, Part B and the recently enacted Part D.

9.      Medicare Part A (Hospital Insurance) helps cover inpatient care in hospitals, including critical access hospitals, and skilled nursing facilities (not custodial or long-term care). Part A also helps cover hospice care and some home health care.

10.     Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care, as well as other medical services not covered by Part A. Part B also helps pay for covered health services and supplies when they are medically necessary.

11.     Medicare Part D (Prescription Drug Plan) provides beneficiaries with assistance in paying for out-patient prescription drugs.

12.     Payments from the Medicare Program come from a trust fund - known as the Medicare Trust Fund - which is funded through payroll deductions taken from the work force, in addition to government contributions. Over the last forty years, the Medicare Program has

3

enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

13.    The Medicare Program is administered through the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.

14.    In order to be reimbursed by Medicare for services rendered to Medicare beneficiaries, all healthcare providers, including physicians, must comply with applicable statutes, regulations and guidelines. All providers that bill Medicare for services also have a duty to be knowledgeable about the statutes, regulations and guidelines regarding coverage for those services. Among other things, Medicare statutes provide that Medicare covers only reasonable and necessary medical services. *See* 42 U.S.C. § l395y(a) (l) (A); *see also* 42 U.S.C. § l320c-5(a) (1). Similarly, Medicare regulations explicitly exclude from payment services that are not reasonable and necessary for the diagnosis or treatment of illness or injury. *See* 42 CFR 411.15{k} (1).

15.    Federal law specifically prohibits providers from making "any false statement or representation of a material fact in any application for any ... payment under a Federal health care program." *See* 42 U.S.C. §1320-a-7b(a)(l).

16.    Similarly, Federal law requires providers who discover material omissions or errors in claims submitted to Medicare, Medicaid, or other Federal health care programs to disclose those omissions or errors to the government. *See* 42 U.S.C. §1320-a-7b(a)(3). The requirement that providers be truthful in submitting claims for reimbursement is a precondition for participation in the Medicare program, the Medicaid program, and other Federal and State funded health care programs. *See, e.g.,* 42 CFR §§ 1003.l05, 1003.102(a)(l)-(2).

17.    Under Medicare Part B, the federal government contracts with insurance companies and other organizations known as "home health agencies" ("HHAs") to provide, among other things, oxygen and respiratory services and devices. On a physician's certification,

4

Part B Medicare will cover various services and the provision of certain Durable Medical Equipment ("DME") pursuant to the Social Security Act, 42 U.S.C. §§ 1395x (n).

18.     Suppliers that sell or rent Medicare covered DME, prosthetics, orthotics, oxygen and other supplies (collectively called "DMEPOS") are required to qualify and adhere to minimum standards and certification in order to obtain a Medicare provider/supplier billing number, and certain regional carriers are designated to process all DMEPOS claims.

19.     Oxygen and respiratory therapy services and devices provided by Lincare to in-home patients are covered by Part B Medicare, and are paid for by Medicare pursuant to fee schedules established by the regional carriers. Oxygen and respiratory equipment are reimbursed pursuant to a regional fee schedule set by the regional carriers for said class of equipment.

20.     In order to bill Medicare Part B, a service provider or supplier must submit an electronic or hard-copy claim form called the CMS 1500 (formerly the HCFA 1500). A completed claim form identifies, among other things, the provider, the patient, the referring physician, the supplies/services provided, the diagnosis code, and the amount charged. The service provider or supplier (as applicable) certifies on the CMS 1500 that the items billed on the form were "medically indicated and necessary for the health of the patient."

21.     The Defendants and their agents are, or have previously been, enrolled with the Medicare Program and have been assigned multiple National Provider Identifier ("NPIs") numbers.  Lincare has hundreds of NPI numbers, including at least six assigned to offices located in this district.  Optigen has at least one (No. 1578592309).

22.     When billing for goods or services to Medicare,  Medicaid and Tricare, the Defendants, like other providers, designate the goods or services that have been provided by using the Healthcare Common Procedure Coding System ("HCPCS," often pronounced by its acronym as "hick picks").  The "Level I" codes of HCPCS are numeric, and are based on the Current Procedural Terminology ("CPT") codes, a medical code set maintained by the American Medical Association through the CPT Editorial Panel.   The CPT code set describes medical,

surgical, and diagnostic services and is designed to communicate uniform information about medical services. HSPCS' "Level II" codes are alphanumeric, and primarily include nonphysician services and items and supplies, including but not limited to DMEPOS. "Level III" codes, or local codes, were developed by state Medicaid agencies and contractors, and apply only for use in specific programs and jurisdictions.

23.     Like other Medicare providers, Defendants have agreed in the Medicare Enrollment Applications they signed "to abide by the Medicare laws, regulations and program instructions that apply to" the provider; "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions"; to "not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare"; and to "not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

24.     At all times relevant herein, Defendants submitted claims to Medicare for Part B services rendered to Medicare beneficiaries to the designated Medicare Part B Carriers, and also submitted claims to Tricare.

The Tricare Program

25.     Tricare is the federal government's program for civilian health benefits for active duty military personnel, military retirees, and their dependents, including some members of the Reserve Component.

26.     At all relevant times, the applicable regulations under Tricare were substantially similar to those alleged above in connection with Medicare. *See* 32 C.F.R. § 199.1 et. seq. Tricare provides varying levels of coverage depending whether the insured is an active duty service member (ADSM), an active duty family member (ADFM) or a retiree.

27.     Medicare's HCPCS codes and pricing are also applicable to Tricare.

**Traditional Ventilators, BiPAP and CPAP Treatment and Defendants' Business**

28.    A variety of DMEPOS products provide assistance to patients who experience difficulty breathing.

29.    A ventilator is a machine designed to mechanically move breathable air into and out of the lungs, to provide the mechanism of breathing for a patient who is physically unable to breathe, or breathing insufficiently.  Traditional ventilators require endotracheal intubation, or the insertion of a tube into the windpipe (trachea) through the mouth or nose, although some ventilators can function through non-invasive interfaces.

30.    A ventilator can be set to completely take over the patient's breathing.  They are considered life-critical systems, and precautions must be taken to ensure that all of their mechanical systems are highly reliable. This includes their power-supply provision. Mechanical ventilators are therefore carefully designed so that no single point of failure can endanger the patient. They may have manual backup mechanisms to enable hand-driven respiration in the absence of power (such as the mechanical ventilator integrated into an anesthetic machine). They may also have safety valves, which open to atmosphere in the absence of power to act as an anti-suffocation valve for the spontaneously breathing patient

31.    Ventilators are generally covered under Medicare for "neuromuscular diseases, thoracic restrictive diseases, and chronic respiratory failure consequent to chronic obstructive pulmonary disease." The Centers for Medicare & Medicaid Services (CMS) National Coverage Determinations Manual (Internet-Only Manual, Publ. 100-3), Chapter 1, Part 4, Section 280.1

32.    "CPAP," or continuous positive airway pressure, is a treatment that uses mild air pressure to keep the airways open.  "BiPAP," which stands for Bilevel Positive Airway Pressure, is very similar in function and design to a CPAP machine.  The difference between BiPAP and CPAP is that BiPAP machines have two pressure settings: the prescribed pressure for inhalation, and a lower pressure for exhalation.  The dual settings may allow the patient to get more air in

and out of their lungs, particularly patients with a high breathing pressure who find it difficult to exhale into the incoming air pressure from a CPAP device.

33.    CPAP/BiPAP is a less invasive alternative to ventilator therapy.  BiPAP and CPAP provide non-invasive ventilatory assistance through the use of a nasal or face mask. Invasive ventilators are more complex and expensive, have additional functionality, and are provided for more serious medical conditions than CPAP devices.

34.    Unlike a ventilator, CPAP and BiPAP only assist the patient with breathing, and cannot be set to completely take over the patient's breathing.  Accordingly, CPAP and BiPAP devices are appropriate for conditions that are not life-threatening, and for which interruption of respiratory support would not quickly lead to serious harm or death.   CPAP and BiPAP are typically used by patients with sleep apnea.  Sleep apnea is a common disorder that causes pauses in breathing or shallow breaths while sleeping.  As a result, not enough air breaches the lungs.

35.    Some ventilators can perform the functions of CPAP and BiPAP machines, but a ventilator is not eligible for reimbursement for sleep apnea, or any other medical conditions for which a CPAP/BiPAP is appropriate.  A ventilator is too expensive a device to be purchased to perform the more limited functions of CPAP and BiPAP.

### Defendants' Business

36.    Lincare has at all pertinent times been engaged in the business of providing oxygen, respiratory and other chronic therapy services to patients in the home, and also providing a variety of DMEPOS and home infusion therapies in certain geographic markets. The DMEPOS provided by Lincare includes a variety of  home oxygen equipment. Among the respiratory equipment provided by Lincare is equipment for CPAP.

37.    Optigen describes itself as the "world leader" in respiratory therapy services to military service persons and military-affiliated civilians.  Providing CPAP equipment, and CPAP-related services, to military personnel, is the focus of Optigen's business.  In addition to

8

the CPAP device itself, Optigen supplies patients with various accessories necessary to its use, including masks, seals, nasal pillows, headgear, and filters.

## DEFENDANTS' FRAUDULENT BILLING TO MEDICARE AND TRICARE
### A. Fraudulent Billing of Batteries and Accessories Used for CPAP

38.    For patients for whom CPAP treatment is indicated, Medicare and Tricare will cover CPAP devices, as well as certain additional DMEPOS, including masks, seals, nasal pillows, headgear, and filters. CPAP devices, and covered accessories have specific HCPCS codes assigned to them, and include (but are not necessarily limited to):

| Code | Equipment |
|------|-----------|
| A4604 | CPAP tubing, heated breathing tube |
| A7030 | Full face mask |
| A7031 | full face cushion |
| A7032 | mask cushions |
| A7033 | mask pillows |
| A7034 | mask interface |
| A7035 | Headgear |
| A7036 | chin strap |
| A7037 | Tubing |
| A7038 | disposable filters |
| A7039 | permanent filter |
| A7044 | CPAP Full Oral Interface |
| A7046 | humidifier chamber |
| E0561 | PAP Passover Humidifier |
| E0562 | CPAP Heated Humidifier |
| E0601 | CPAP device |
| E1399 | CPAP Miscellaneous |

Traditional ventilators and accessories, in contrast, have a different set of applicable HCPCS codes. During the period of Relator's employment with Lincare, these codes have included, but are not necessarily limited to, the following:

| Code | Equipment |
|------|-----------|
| A4611* | Battery, heavy duty; replacement for client-owned ventilator |
| A4612* | Battery, cables; replacement for client-owned ventilator |
| A4613* | Battery charger; replacement for client-owned ventilator |
| A4618 | Breathing circuits, for client-owned ventilator |
| E0450** | Volume ventilator; stationary or portable, with backup rate feature, used with invasive interface (e.g., tracheotomy tube) |
| E0457** | Chest shell (cuirass) |
| E0459** | Chest wrap |
| E0460** | Negative pressure ventilator; portable or stationary |
| E0461** | Volume control ventilator, noninvasive interface |
| E0463** | Pressure support ventilator invasive interface |
| E0464** | Pressure support ventilator, noninvasive interface |

*deleted as of 1/1/2014
** deleted and replaced, as of 1/1/2016, with two replacement codes for invasive (E0465) and non-invasive (E0466) ventilators

39.     CPAP devices are typically powered from ordinary AC outlets, although they can be powered by battery packs.  Batteries (and battery accessories, such as chargers or cables) for use with CPAP devices are generally not covered under Medicare or Tricare.  This is because CPAP is prescribed for non-life-threatening conditions for which an interruption in use will not cause the risk of immediate harm to the patient.  They are generally considered to be comfort or

10

convenience items, and have no specific code in the HCPCS, which is vital to determining the amount of coverage provided for an item of DME by Medicare or Tricare.

40.     Optigen provides batteries and battery-related accessories to all or substantially all active duty Tricare beneficiaries obtaining CPAP equipment in what is referred to as a "Deployment Pack" or "D-Pack," and bills them to Tricare for the vast majority of CPAP users, it is not necessary and AC power is sufficient to operate their CPAP devices.  When batteries were shipped, the accessories shipped with the batteries were (1) a battery charger, for charging the battery with an AC power source, and (2) cables, for connecting the battery with the CPAP device.

41.     At least through 2013, Optigen systematically miscoded the CPAP batteries, charges and cables under the HCPCS codes applicable to ventilator batteries and battery accessories. Optigen engaged in this practice for two purposes:  (1) it enhanced Optigen's chances of obtaining reimbursement, because CPAP batteries and accessories were generally not covered and there were existing codes for ventilator batteries and accessories, and (2) it enabled Optigen to obtain a higher rate of reimbursement, as ventilator batteries and battery accessories generally are more expensive than those necessary to power a CPAP device by battery.

42.     During this time period, when providing CPAP batteries, chargers and cables, Optigen billed them under the following codes: A4611 (Ventilator Battery), A4612 (Ventilator Battery Charger), and  A4613 (Ventilator Battery Cables).  Amounts payable under these HCPCS codes vary slightly from region to region.  But the following screen shot (Image No. 1) of Optigen billing records shows prices that were typical at the time it was entered (June 2013) - $191.43 for a battery pack (billed under A4611), $119.45 for a battery charger (billed under code A4612) and $77.90 for a battery cable (billed under code A4613):

**Image No. 1:**



The patient whose batteries were miscoded, resulting in unlawful excessive reimbursement by Tricare to Optigen was a United States Army serviceman stationed at Ft. Hood, Texas. The DMEPOS were shipped on or about June 12, 2013, as reflected in the insert above. The serviceman's name and other personal identifiers, including his Social Security number, are withheld to protect his privacy but can be provided by the Relator if adequate confidentiality protections are available for the information.

43.     The total costs claimed in this particular example for a CPAP battery and related accessories was $388.68 under the coding for ventilator batteries. This greatly exceeded what was necessary to pay to obtain the battery and accessories. A battery, charger and cables for most CPAP devices can presently be obtained, from various vendors, for a total price between $229 and $269. Further, no showing of medical necessity was made. Optigen has reaped substantial profits from this scheme.

44.     The following images, Images Nos. 2 and 3, are excerpts from Optigen accounting records. They reflect that the HCPCS codes specifically applicable to ventilator batteries and battery accessories were being used for CPAP patients (who received CPAP-specific DMEPOS using proper CPAP HCPCS codes). Patient names are redacted to protect their privacy but can be provided by the Relator if adequate confidentiality protections are available for the information:

**Image No. 2:**



06/28/2012
03 56 PM

**OPTIGEN, INC**

**Payments Created by Auto-Post**

Page Number    5

Date  06/27/20__
ch ld  TR__

Check Number 5075314174SA2

Check Date 06/26/2012

Date Received  06/28/2012

| Patient Name | Trx-Seq | CPT Code | Date From | Modifiers | Source | Amount |
|---|---|---|---|---|---|---|
| REDACTED | 0021 | A4612 | 06/19/2012 | NU | PRI | 77.__ |
| | 0030 | A4613 | 06/19/2012 | NU | PRI | 118.__ |
| | 0019 | A7036 | 06/19/2012 | NU | PRI | 25.__ |
| | 0020 | A4611 | 06/19/2012 | NU | PRI | 189.__ |
| | 0008 | A7038 | 06/19/2012 | NU | PRI | 102.__ |
| | 0015 | A7034 | 06/19/2012 | NU | PRI | 39_.__ |
| | 0018 | A7039 | 06/19/2012 | NU | PRI | _1.71 |
| | 0017 | A7037 | 06/19/2012 | NU | PRI | 127.76 |
| | 00__ | A70__ | 06/19/2012 | NU | | 16.25 |

**Image No. 3:**

| | 00__ | A70__ | 06/__/2012 | NU | PRI | 103.46 |
|---|---|---|---|---|---|---|
| 33164 | 0023 | A7037 | 06/08/2012 | NU | PRI | 34.72 |
| 18600 | 0052 | A7035 | 06/11/2012 | NU | PRI | 31.16 |
| 18600 | 0055 | A7038 | 06/11/2012 | NU | PRI | 8.08 |
| 18600 | 0053 | A7034 | 06/11/2012 | NU | PRI | 103.46 |
| 18600 | 0054 | A7037 | 06/11/2012 | NU | PRI | 34.49 |
| 43045 | 000__ | A70__ | 06/09/2012 | NU | PRI | _.50 |
| 43045 | 000__ | A7030 | 06/09/2012 | NU | PRI | 16_.__ |
| 43045 | 0007 | A7037 | 06/09/2012 | NU | PRI | 35.40 |
| 24057 | 0047 | A7035 | 06/11/2012 | NU | PRI | 34.95 |
| 24057 | 0054 | A4612 | 06/11/2012 | NU | PRI | 81.57 |
| 24057 | 0052 | A4613 | 06/11/2012 | NU | PRI | 125.09 |
| 240__ | 0053 | A4611 | 06/11/2012 | NU | PRI | 170.39 |
| 24__7 REDACTED | 0048 | A7038 | 06/11/2012 | NU | PRI | 57.00 |
| _057 | 0046 | A7034 | 06/11/2012 | NU | PRI | 103.46 |
| _057 | 0049 | A7037 | 06/11/2012 | NU | PRI | 72.14 |
| _057 | 0050 | A7046 | 06/11/2012 | NU | PRI | 17.16 |
| _45 | 0015 | A7035 | 06/09/2012 | NU | PRI | 31._ |
| 40__ | 0018 | A7038 | 06/09/2012 | NU | PRI | _.08 |
| 40945 | 0016 | A7030 | 06/09/2012 | NU | PRI | 165.91 |
| 40945 | 00__ | A70__ | 06/09/2012 | NU | PRI | 13.48 |
| 40945 | 0017 | A7037 | 06/09/2012 | NU | | 34.49 |

13

**B. Systematic Waiver of Copayments for Alleged Financial Hardship**

45.     Under Medicare, as with many private insurers, copayments are required for most medical services and DME– typically a 20% copayment for beneficiaries who do not have supplemental insurance.  Under Tricare, active duty military personnel typically are not required to pay copayments for DME or for medical services, but many other beneficiaries (such as retired military personnel) are required to pay copayments of 15-25% for DME, depending on the specific Tricare plans under which they are covered.

46.     In 1994, the Department of Health and Human Service's Office of the Inspector General issued a Special Fraud Alert detailing how and why routine waivers of co-pay for charge are considered fraud:

> A provider, practitioner or supplier who routinely waives Medicare copayments or deductibles is misstating its actual charge. For example, if a supplier claims that its charge for a piece of equipment is $100, but routinely waives the copayment, the actual charge is $80. Medicare should be paying 80 percent of $80 (or $64), rather than 80 percent of $100 (or $80). As a result of the supplier's misrepresentation, the Medicare program is paying $16 more than it should for this item.
> ...
> At first glance, it may appear that routine waiver of copayments and deductibles helps Medicare beneficiaries. By waiving Medicare copayments and deductibles, the provider of services may claim that the beneficiary incurs no costs. In fact, this is not true. Studies have shown that if patients are required to pay even a small portion of their care, they will be better health care consumers, and select items or services because they are medically needed, rather than simply because they are free. Ultimately, if Medicare pays more for an item or service than it should, or if it pays for unnecessary items or services, there are less Medicare funds available to pay for truly needed services.
> ...
> **This hardship exception, however, must not be used routinely; it should be used occasionally to address the special financial needs of a particular patient. Except in such special cases, a good faith effort to collect deductibles and copayments must be made.**
> ...
> Routine use of ``Financial hardship'' forms which state that the beneficiary is unable to pay the coinsurance/deductible (i.e., there is no good faith attempt to determine the beneficiary's actual financial condition)

14

OIG Special Fraud Alert (1994) "Routine Waiver of Medicare Part B Copayments and Deductibles." *Available at* http://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html (emphasis added).

47.     Conditions are set forth under which co-pay waiver may be legally granted: "(i) the waiver is not offered as part of any advertisement or solicitation; (ii) the person does not routinely waive coinsurance or deductible amounts; and (iii) the person (I) waives the coinsurance and deductible amounts after determining in good faith that the individual is in financial need; or (II) fails to collect coinsurance or deductible amounts after making reasonable collection efforts." 42 U.S.C. 1320a-7a(i).

48.     In order to demonstrate good faith, providers often seek proof of financial hardship, including, *inter alia*, W-2 forms, pay stubs, tax returns, bankruptcy settlement forms, or documentary proof of a catastrophic situation..

49.     Medicare and Tricare are subject to precisely the same standards in relation to copay waivers for financial hardship. The Tricare Provider Handbook warns that one marker of fraud on the system is "[a] pattern of waiver of beneficiary (patient) copayment, cost-share, or deductible." Tricare Provider Handbook, 2013, *available at* https://www.unitedhealthcareonline.com/ccmcontent/ProviderII/UHC/en-US/Assets/ProviderStaticFiles/ProviderStaticFilesPdf/Tools%20and%20Resources/Policies%20and%20Protocols/TRICARE_Provider_Handbook_2013.pdf at103.

50.     Contrary to these well-established guidelines, Optigen routinely waives co-pays for its patients with the mere submission of a very basic hardship waiver form (historically, Optigen included the form in every patient's "set up" packet).  Most importantly Optigen does not require patients to submit any financial information or documents to support a hardship waiver.  An example of such a form, received in August 2014, follows as Image No. 4:

**Image  No. 4:**



1351 13ᵗʰ Avenue S, Suite 100
Jacksonville Beach, Florida 32250
Phone: 800-273-9114   Fax: 877-339-0180

RECEIVED AUG 1 8 2014

### FINANCIAL HARDSHIP REQUEST FORM

I certify that I have a financial hardship due to unforeseen circumstances and therefore I am unable to pay my outstanding balance and/or co-insurance with Optigen, Inc.

Date:   7/3/2014

Patient ID#:    35971

Patient Name:    REDACTED

Date of Birth:  1/20/1994

Address:    REDACTED
CORONA, CA  92879-0000

REDACTED

_____          July 21, 2014
Signature                                             Date

Please sign this form and return in the stamped envelope provided.
Thank you,

Optigen, Inc.

We will mail hard copy asap. We are faxing you this form on 7/22/14. Thanks!

REDACTED
REDACTED   's Mother

1351 13ᵗʰ Avenue S, Suite 100, Jacksonville Beach, FL 32250  USA
Phone: 800-273-9114 :: Fax: 877-339-0180
www.Optigen.net

16

51.     Optigen, operating in bad faith, makes no attempt to verify the truth of these assertions, submitting bills for these patients' care to Tricare and obtaining unlawful reimbursements.

52.     Optigen routinely provides these forms to patients, without any further attempt to verify that the patient faces genuine financial hardship.

53.     Relater Jaime Vargas, while employed by Lincare with responsibility pertaining to the operations of Optigen, witnessed this routine practice and the subsequent submission of claims for services provided to these customers, as well as the billing of fraudulently obtained fees collected by Optigen from the federal government.

### C. Systematic Shipping of Un-Ordered and Unnecessary CPAP Supplies

54.     Medicare and Tricare will cover replacement supplies necessary for CPAP administration.  CPAP patients are allowed replacement supplies per Medicare and Tricare guidelines at regular intervals depending on what the item is (mask, seal, nasal pillows, headgear, filters, etc.). These items can be quite expensive, especially masks.

55.     One of the measures Lincare employs to assess the performance of their employees and locations (including both Optigen and Lincare employees) is by how many reorders the location (or call center) receives per month. Thresholds are set and the employees are pressured to ship supplies by Lincare corporate and management.

56.     The Relator heard many either irate phone calls, and witnessed actual visits to the locations by, irritated patients who complained about the back-stock of supplies they keep receiving every month from Lincare or Optigen (although it was many). When asked if they ever spoke with anyone from the company prior to these shipments being made, the response was usually "NO." In many instances, a call would be made to the patient and a message would be left on the patient's answering machine. If the patient did not respond to the message, the supplies would be shipped.  In most cases, the extra supplies would not be taken back (or refunded to Medicare/Tricare) because no supply item can be returned if 30 days has past. Most

17

of the people receiving these items are elderly and do not have the means to return the supplies within that time period.

57.     The Relator would instruct Lincare/Optigen staff that supplies are only to be shipped when actually ordered by the patient.  But due to the strong financial incentives, the Relator believes his instructions were disregarded.

58.     Relator can identify specific patients who received unauthorized shipments from Optigen if adequate confidentiality protections are provided for that information.

### D.  Illegal Kickbacks to Medical Office Personnel and Other Referral Sources in the Form of "Setup Fees" and Gifts

59.     Optigen contracts remote clinicians (usually employees of a medical practice) throughout the United States (which it refers to as "Contract Field Technicians," or "CFTs") to perform the clinical installations or "set ups" of PAP equipment the company receives orders for.

60.     Optigen pays setup fees of anywhere from $100.00 to $225.00 depending on the region and other circumstances. A set up takes most clinicians about 45 minutes to perform.

61.     The fee exceeds the reasonable cost of the setup, and creates a conflict of interest as it encourages referrals to Optigen.

62.     Optigen intentionally recruits CFTs, and encourages them to cause their medical practices to prescribe CPAP and to order it from Optigen, and touts the setup fees in order to entice them to refer more patients.

63.     Optigen systematically tracks its remote clinicians in a database. Some CFTs perform as many as 150 installations in a single quarter.

64.     Optigen's practice of paying these setup fees to CFTs constitutes an illegal kickback to encourage referrals.

65.     Optigen and Lincare contractors and sales personnel also often provide meals and gifts to health care providers who are potential referral sources.  An Example was in Colorado Springs, Colorado, where Irma Kulikowski, a contractor, was directed by Renee Cassaniti, the

18

Regional Sales Manager, to buy over $300.00 worth of food to hold a luncheon for certain Air Force Academy medical staff. The Relator was instructed by the regional manager, Sheila Drake, to conceal this expense, since contractors were being used for marketing. Lucy Bayot, a Lincare contractor in Hawaii, is another example, as she frequently brings gift baskets and other items to health care providers. These in-kind meals and gifts also constitute illegal kickbacks.

## COUNT I
### False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A), (B)

66.     The foregoing paragraphs are hereby incorporated by reference.

67.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

68.     By virtue of the acts described above, Defendants, in reckless disregard or deliberate ignorance for the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and continue to present or cause to be presented, false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729 (a)(1)(A).

69.     By virtue of the acts described above, Defendants, in reckless disregard or deliberate ignorance for the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and continue to knowingly make, use or cause to be made or used, false records and statements, and omitted material facts, to induce the government to approve and pay such false and fraudulent claims, in violation of 31 U.S.C. § 3729 (a)(1)(B).

70.     Each claim (including each invoice) Defendants submitted for payment constituted a false claim and a false record or statement to get false or fraudulent claims paid by the government.

19

71.     Relator cannot at this time identify all of the false claims that were caused by Defendants' conduct.  Documentation of such claims is in the possession of the government and the Defendants, and Relator has no access to such records.

72.     The government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid the claims that would not have been paid but for Defendants' illegal conduct.

73.     By reason of Defendants' acts, the United States has been damaged in a substantial amount to be determined at trial.

**COUNT II**
**Violations of the Federal Anti-Kickback Statute**
**42 U.S.C. § 1320a-7b(b)**

74.     The foregoing paragraphs are hereby incorporated by reference.

75.     Optigen's financial relationships with its CFTs , and Defendants' provision of gifts to providers, violate the federal Anti-Kickback Statute.

76.     Payments to CFTs " disguised as "setup fees," and gifts to providers and CFTs, constitute remuneration offered to induce, or in return for, the referral of business paid for by federal programs, including Medicare or Medicaid.

77.     Defendants knowingly made excessive payments and provided gifts to CFTs and others as financial inducement for patient referrals to Optigen  and Lincare, which services were paid for by federal programs, including Medicare, Medicaid, etc., in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

78.     The foregoing financial arrangements are not protected under the existing "safe harbor" regulations.

79.     As of calendar year 2012, Optigen paid setup fees of approximately $1.1 million per year to CFTs in exchange for referrals.

20

80.     For each of these federal Anti-Kickback Statute violations, Defendants are subject to penalties of up to $50,000 for each improper act, plus damages of up to three times the amount of the improper remuneration at issue. 42 U.S.C. § 1320a-7a(a).

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against the Defendants as follows:

1.     That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq*, and 42 U.S.C. § 1320a-7b(b);

2.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States have sustained because of Defendants' actions, plus interest and a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, and penalties of up to $50,000 for each improper act, plus damages of up to three times the amount of the improper remuneration at issue, for each violation of 42 U.S.C. § 1320a-7a(a);

3.     That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

4.     That the United States and Relator recover such other relief as the Court deems just and proper

RELATOR HEREBY DEMANDS TRIAL BY JURY.

Dated:  August 14, 2017

_____
Daniel M. Cohen, Esq., Fla. Bar No.797472
Charles J. LaDuca
Matthew E. Miller
Cuneo Gilbert & LaDuca, LLP
4725 Wisconsin Ave., N.W.
Washington, DC 20016
Telephone:  (202)789-3960
Facsimile:   (202)789-1813
danielc@cuneolaw.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on August 14, 2017, I served the foregoing document in this sealed action by electronic mail and First Class Mail upon Jason P. Mehta, Esq., Assistant United States Attorney, at 300 North Hogan Street, Suite 700, Jacksonville, Florida 32202, and Jason.Mehta@usdoj.gov. Neither of the Defendants has appeared in this action.

Dated:  August 14, 2017

Billy Czerwinski

22